**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

KATHLEEN K.[1],
Plaintiff,

Case No. 3:25-cv-166
Litkovitz, M.J.

vs.

COMMISSIONER OF SOCIAL SECURITY,
Defendant.

**ORDER**

Plaintiff Kathleen K. brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the final decision of the Commissioner of Social Security (Commissioner) denying plaintiff's applications for disability insurance benefits (DIB) and supplemental security income (SSI). This matter is before the Court on plaintiff's Statement of Errors (Doc. 12), the Commissioner's response (Doc. 15), and plaintiff's reply (Doc. 16).

## I. Procedural Background

Plaintiff protectively filed her applications for SSI on December 23, 2022 and for DIB on February 22, 2023, alleging an onset of disability of January 1, 2019, due to learning disabilities and problems with reading and writing. (Tr. 252). Her applications were denied initially and upon reconsideration. Plaintiff, through counsel, requested and was granted a *de novo* hearing before administrative law judge (ALJ) Gregory Kenyon. Plaintiff and a vocational expert (VE) appeared telephonically and testified at the ALJ hearing on April 12, 2024. (Tr. 50-78). On May 18, 2024, the ALJ issued a decision denying plaintiff's applications. (Tr. 31-49). On April 7,

[1] Pursuant to General Order 22-01, due to significant privacy concerns in social security cases, any opinion, order, judgment, or other disposition in social security cases in the Southern District of Ohio shall refer to plaintiffs only by their first names and last initials.

2025, the Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-6).

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A) (DIB), 1382c(a)(3)(A) (SSI). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)).[2] The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.*; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers*, 582 F.3d at 652; *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999).

**B. The Administrative Law Judge's Findings**

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

1. [Plaintiff] meets the insured status requirements of the Social Security Act through March 31, 2022.

2. [Plaintiff] has not engaged in substantial gainful activity since January 1, 2019, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. [Plaintiff] has the following severe impairments: a bipolar disorder; a personality disorder; borderline intellectual functioning; an anxiety disorder; and post-traumatic stress disorder (PTSD) (20 CFR 404.1520(c) and 416.920(c)).

4. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20

[2] "The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical . . . and are found at 20 C.F.R. § 404.1520, and 20 C.F.R. § 416.920 respectively." *Miller v. Comm'r of Soc. Sec.*, No. 3:18-cv-281, 2019 WL 4253867, at *1 n.1 (S.D. Ohio Sept. 9, 2019) (quoting *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007)). The Court's references to DIB regulations should be read to incorporate the corresponding and identical SSI regulations, and vice versa, for purposes of this Order.

CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the [ALJ] finds that [plaintiff] has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: (1) simple, routine, repetitive tasks; (2) occasional contact with co-workers and supervisors; (3) no public contact; (4) no teamwork or tandem tasks; (5) no close over the shoulder supervision; (6) no fast paced work; (7) no strict production quotas; and (8) very little if, if any, change in the job duties or the work routine from one day to the next.

6. [Plaintiff] is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).[3]

7. [Plaintiff] was born [in] . . . 1980 and was 38 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. [Plaintiff] has at least a high school education (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that [plaintiff] is "not disabled," whether or not [plaintiff] has transferable job skills (*See* SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering [plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [plaintiff] can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).[4]

11. [Plaintiff] has not been under a disability, as defined in the Social Security Act, from January 1, 2019, through the date of this decision (20 CFR 404.1520(g) and 416.920(g).

(Tr. 17-24).

---

[3] Plaintiff's past relevant work was as a material handler, a heavy, semi-skilled position, performed at the light level of exertion. (Tr. 23, 74).

[4] The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the requirements of representative medium, unskilled occupations such as machine packager (80,000 jobs nationally), dishwasher (110,000 jobs nationally), and cleaner (55,000 jobs nationally). (Tr. 23-24, 75-76).

**C. Judicial Standard of Review**

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers,* 582 F.3d at 651 (quoting *Bowen,* 478 F.3d at 746). *See also Napier v. Comm'r of Soc. Sec.*, 127 F.4th 1000, 1004 (6th Cir. 2025) ("Even when an ALJ's decision is supported by substantial evidence, we will reverse the decision if we find that

the ALJ failed to follow the applicable procedural regulations.") (citing *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 833 (6th Cir. 2016)).

**D. Relevant Educational Records and Medical Evidence**

1. Educational Records

Plaintiff's education records indicate she was placed in the "Developmentally Handicapped" program at the age of seven and has a history of ADHD symptoms and treatment with Ritalin. (Tr. 330). In 1997 at the age of 17, plaintiff's IQ was tested using the Wechsler Adult Intelligence Scale—Revised (WAIS-R). She obtained a verbal IQ score of 73, a performance IQ score of 70, and a full-scale IQ score of 71. (Tr. 334-36). She also scored low in the following categories of the Wechsler Individual Achievement Test (WIAT), a standardized, individually administered academic achievement test: $0.9^{th}$ percentile in reading; 1st percentile in reading comprehension; $.06^{th}$ percentile in math calculation; 1st percentile in math reasoning; and $0.3^{rd}$ percentile in written language. (Tr. 334). Her Individualized Education Plan (IEP), completed in 1998, noted that her behavior impeded her learning and the learning of others, she could be overbearing or aggressive, and she intimidated her peers. (Tr. 321-22). In January 1998, John M. Williams, a school psychologist, assessed plaintiff's adaptive functioning using the Vineland Adaptive Behavior Scales. Her composite score was 59, placing her in the $0.7^{th}$ percentile nationally. (Tr. 338).

2. James Tanley, Ph.D.

Consultative examiner Dr. Tanley examined plaintiff and administered psychometric tests on June 26, 2007. (Tr. 343-47). At that time, plaintiff was 27 years old and reported having

problems reading, writing, and holding down a job—noting that she had been fired from every job she had ever had. (Tr. 344). Dr. Tanley noted that "[d]espite additional questioning by this examiner, no other substantive information was able to be elicited." (*Id.*). Dr. Tanley noted that plaintiff lived with her parents and husband and was unemployed. (Tr. 347).

On mental status examination, plaintiff was polite and cooperative. Her thoughts were coherent, relevant, and goal oriented. She was dressed casually and appropriately. Her speech was within normal limitations. She appeared depressed and somewhat irritable with a flat affect. She was not tearful and there were no indications of anxiety. Dr. Tanley also noted plaintiff may be suspicious or paranoid of others but found her judgment to be sufficient. (Tr. 345). Dr. Tanley further noted that plaintiff's recent and remote memory were sufficient to poor. (Tr. 345).

Dr. Tanley tested plaintiff's IQ using the Wechsler Adult Intelligence Scale (WAIS-III), revealing a verbal score of 66; performance score of 62; and a full-scale score of 61. (Tr. 346). Dr. Tanley noted that plaintiff "put forth a sincere effort" and believed the results to be valid. (Tr. 346). Dr. Tanley did not have access to her school records and therefore could not establish onset prior to the age of 18. (Tr. 346). Dr. Tanley deferred any Axis II diagnosis. (Tr. 346-47).

Dr. Tanley opined that given her IQ scores, plaintiff appeared at risk for mismanaging any funds granted. Dr. Tanley also noted that "[h]er judgment per the Comprehension subtest of the WAIS-II is in the MR range for making important life decisions and conducting her own living arrangements." (Tr. 345). Dr. Tanley then opined plaintiff "probably could participate in a well structured treatment program." (*Id.*).

Dr. Tanley opined plaintiff was mildly impaired in her ability to relate to others due to her apparent lack of knowledge. Dr. Tanley opined moderate impairment in plaintiff's ability to understand and follow simple instructions and moderate impairment in her ability to maintain attention to perform simple, repetitive tasks. (Tr. 346).

3. Mental Health Counselor Jody Bindas

In April 2022, plaintiff was referred for a mental health diagnostic assessment by the Champaign County Municipal Court after a domestic violence incident with her husband. On April 5, 2022, plaintiff was assessed by Jody Bindas, a licensed Mental Health Counselor. (Tr. 506). Ms. Bindas noted plaintiff's reported history of aggression toward people, inability to control her temper, deliberate destruction of property, and grossly inappropriate response to situations resulting in serious assaultive acts. (Tr. 511). Plaintiff endorsed that she often argues with adults, loses her temper, and blames others for her mistakes or misbehavior. (*Id.*). She reported experiencing moderate levels of excessive worry, restlessness, fatigue, and irritability; mild levels of poor concentration; and racing, repetitive speech on a daily basis. (Tr. 513). Based on plaintiff's self-report, Ms. Bindas diagnosed her with moderate intermittent explosive disorder; moderate generalized anxiety disorder; and mild, unspecified bipolar disorder. (Tr. 515). Ms. Bindas recommended individual sessions of anger management therapy. (*Id.*).

On April 27, 2022, Ms. Bindas assessed plaintiffs mental status. Plaintiff appeared well groomed; her behavior and speech were normal; her attitude was cooperative; her thought process and content were normal; she exhibited no psychosis; her mood was euthymic; her affect was full range; she was not suicidal or homicidal; her cognition was normal; and her insight and

judgment were good. (Tr. 523-24). Ms. Binas noted that plaintiff's goal was to "[b]ecome capable of handling angry feelings in constructive ways that enhance daily functioning. 'I would like to complete anger management.'" (Tr. 524).

On May 18, July 12, July 28, and August 22 of 2022, Ms. Binas assessed plaintiff's mental status as normal. (Tr. 526-27, 529-30, 532-33, 535-36). Although plaintiff reported to Ms. Bindas on July 12, 2022, that she was charged with another domestic violence incident involving her ex-husband (Tr. 530), the following month her ex-husband admitted she "never touch[ed] him[,]" and they agreed to go to counseling together. (Tr. 536).

An August 4, 2022, diagnostic assessment update indicated plaintiff was currently seeing her present therapist for anger management. (Tr. 518). Plaintiff "reported she is good at talking with others, working and house work." (*Id.*). Plaintiff also reported that she graduated high school and "her friends and family were supportive." (Tr. 517).

On September 12, November 14, and December 5 of 2022, plaintiff was again assessed as normal on mental status examinations. (Tr. 538-39; 541-42; 544-45). At her November therapy session, she reported the previous domestic violence charge was dismissed because her ex-husband admitted in court that he lied. (Tr. 542).

On October 10, 2023, plaintiff returned to Ms. Bindas after her ex-husband passed away. (Tr. 897). Her mental status was assessed as normal. (Tr. 897-98). Plaintiff initially shared "she did not want counseling" because "she felt ok." (Tr. 898). Plaintiff "later shared she needs counseling and follow through for MH[,] she is applying for SS." (*Id.*). On January 12, 2024, plaintiff reported "[s]he feels it is going better" and "does not need counseling at this time." (Tr.

901). Ms. Bindas instructed plaintiff to call if she needed to return to counseling. (*Id.*). Plaintiff's mental status was normal. (Tr. 900-901).

4. Brian Griffiths, Psy.D.

Dr. Griffiths consultatively examined plaintiff on April 23, 2022. (Tr. 556-62). Plaintiff reported that she graduated from high school, was not identified as a special education student, and argued with her teachers and fought with her classmates; but she denied encountering disciplinary problems. (Tr. 557). Plaintiff worked as a university housekeeper for about two years but lost her job when the cleaning contract was awarded to a competitor. She also worked as an independent home-care provider for ten years but lost that job due to a drug conviction. Plaintiff reported that when she was in the workforce, she "sometimes" shared an argumentative relationship with supervisors, coworkers and the public. (Tr. 558).

Plaintiff stated that she struggles with depression, crying spells, withdrawing from others, and not finding enjoyment in pleasurable or preferred activities. (Tr. 558-59). Plaintiff rated her attention and concentration as "not very good." (Tr. 559). Plaintiff reported experiencing mood swings, irritability, and agitation. Plaintiff described experiencing angry outbursts and a racing mind. (Tr. 559).

On mental status examination, Dr. Griffiths found plaintiff's mood was depressed and somewhat irritable with a flat affect. (*Id.*). Dr. Griffiths noted some of plaintiff's remarks "suggested that she may be suspicious and/or paranoid of others." (Tr. 560). Plaintiff recalled five digits forward but not consistently, and she recalled three and four digits backwards. (*Id.*). She could not calculate twenty-four divided by three. (*Id.*). Narratively, Dr. Griffiths noted

plaintiff had problems with mood regulation, panic attacks, and trauma-related symptoms from intimate partner violence. (*Id.*). Dr. Griffiths observed that her phraseology, grammatical structure, and vocabulary suggested that she is of borderline intelligence. Dr. Griffiths diagnosed plaintiff with unspecified bipolar and related disorder, PTSD, panic disorder, and borderline intellectual functioning. (Tr. 561).

When asked to assess plaintiff's abilities and limitations in understanding, remembering and carrying out instructions, Dr. Griffiths noted she understood and followed simple instructions during the evaluation; however, she "performed marginally on Digit Span, a simple structured test designed to assess her short-term memory skills. She remembered one of three objects after a five-minute delay." (*Id.*). In his assessment of plaintiff's limitations in sustaining concentration and persisting in work-related activity at a reasonable pace, Dr. Griffiths noted she was able to follow the conversation during the interview; she did not ask the examiner to repeat and/or clarify questions; but she was slow to perform serial sevens. Dr. Griffiths noted that plaintiff was slow to perform serial sevens and committed an error counting backwards from twenty by threes—also noting that plaintiff's "statements suggested that she has difficulty mentally focusing." (Tr. 561). Plaintiff reported that she has a good energy level, but she is "easily fatigued." (Tr. 562). Dr. Griffiths noted that plaintiff reported being emotionally unstable, prone to panic attacks, and experiencing additional symptoms associated with PTSD. Dr. Griffiths opined that she is "a low functioning individual" and that her "[i]ntellectual limitations and/or anxiety and/or mood extremes such as depression and/or trauma symptoms like intrusive thoughts, flashbacks and hypervigilance may interfere with [plaintiff's] ability to

keep up with others." (*Id.*). With respect to social interaction, Dr. Griffiths noted plaintiff's reports that she argued with teachers, fought with classmates, and avoided interacting with other employees and the public; and that emotional difficulties caused her to withdraw. Dr. Griffiths stated that "[a]lthough [plaintiff] interacted appropriately with the examiner, she appeared to be a depressed and somewhat irritable individual." (*Id.*). In terms of plaintiff's abilities and limitations in dealing with normal pressure in a competitive work setting, plaintiff's description of her employment history did not strongly suggest to Dr. Griffiths that she emotionally decompensates from exposure to the workplace. Plaintiff reported that she had never been psychiatrically hospitalized and was not using psychoactive medicine. Dr. Griffiths indicated plaintiff's "remarks suggested that stressful situations trigger panic attacks," exacerbate her PTSD, and cause mood extremes including irritability, agitation, and angry outbursts. (*Id.*). With regard to plaintiff's abilities to deal with normal pressure in a competitive work setting, Dr. Griffiths opined that when plaintiff is "overwhelmed and/or provoked, she probably responds impulsively through emotional rather than cognitive channels." (*Id.*).

**E. Specific Errors**

On appeal, plaintiff raises a single assignment of error: "[t]he ALJ's RFC determination is not supported by substantial evidence and is the product of legal error where he devised the mental limitations absent any useful medical guidance and failed to explain how the medical evidence cited supports the specific mental limitations." (Doc. 12 at PageID 968-77). Plaintiff argues that the ALJ erred when evaluating the opinions of the consultative psychologists, Drs. Griffiths and Tanley. (*Id.*). Plaintiff alleges the error was not harmless because the VE testified

that an individual requiring an isolated workstation or the ability to work away from others would be "work preclusive," and that there would be "[n]o tolerance" for a hypothetical individual experiencing angry outbursts at others in the workplace. (Doc. 12 at PageID 967, citing Tr. 76-77).

The Commissioner argues in response that the ALJ carefully reviewed the record and reasonably assessed a comprehensive residual functional capacity for a restricted range of simple work with other nonexertional limitations. The Commissioner maintains that the ALJ reasonably formulated the residual functional capacity based on all the evidence of record. (Doc. 15 at PageID 985-88). The Commissioner further contends that the ALJ reasonably found Dr. Griffiths' opinion generally persuasive, and the residual functional capacity is consistent with that opinion. Finally, the Commissioner argues that the ALJ properly discounted Dr. Tanley's opinion because it was rendered more than a decade before the alleged onset date, was not relevant to the period at issue, and was inconsistent with the evidence of the record. (*Id.*).

In reply, plaintiff reiterates her opening positions, noting "[t]he ALJ's RFC acknowledges [p]laintiff requires severe restrictions mentally, but the ALJ should not have guessed at that level of restriction given the overwhelming severity of [p]laintiff's mental impairments, which includes extremely low functioning along with significant other mental ailments." (Doc. 16 at PageID 991-93)

**F. Analysis**

A claimant's RFC is an assessment of "the most [a claimant] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). The ALJ is charged with the final responsibility in

determining a claimant's RFC based on all of the relevant medical and other evidence. 20 C.F.R. § 404.1545(a)(3), 20 C.F.R. § 404.1546(c). The governing regulations describe five different categories of evidence: (1) objective medical evidence, (2) medical opinions, (3) other medical evidence, (4) evidence from nonmedical sources, and (5) prior administrative medical findings. 20 C.F.R. § 404.1513(a)(1)-(5). With regard to two of these categories—medical opinions and prior administrative findings—an ALJ is not required to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. § 404.1520c(a). "An ALJ does not improperly assume the role of a medical expert by weighing the medical and non-medical evidence before rendering an RFC finding." *Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 439 (6th Cir. 2010) (citing *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009); *Dixon v. Massanari*, 270 F.3d 1171, 1177-78 (7th Cir. 2001)).

The ALJ's decision "cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quoting *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003)). The plaintiff "bears the burden of demonstrating a RFC more restrictive than that determined by the ALJ." *Id*. (citing *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 423 (6th Cir. 2008)).

The ALJ determined that plaintiff had the mental RFC for (1) simple, routine, repetitive tasks; (2) occasional contact with co-workers and supervisors; (3) no public contact; (4) no

teamwork or tandem tasks; (5) no close over the shoulder supervision; (6) no fast paced work; (7) no strict production quotas; and (8) very little if, if any, change in the job duties or the work routine from one day to the next. (Tr. 20). In making this decision, the ALJ evaluated the opinions of the state agency physicians, consultative examiner Dr. Tanley, and consultative examiner Dr. Griffiths and the records of Ms. Bindas.

The state agency consultants concluded there was insufficient evidence to assess plaintiff's work-related limitations. (Tr. 22). The ALJ found the state agency reviewers' conclusions were "not persuasive" because they were inconsistent with the hundreds of pages of evidence and other opinion evidence in the record to make a determination. (*Id.*). Plaintiff does not take issue with this conclusion.

The ALJ concluded that Dr. Tanley's opinions were "not at all persuasive." (Tr. 23). The ALJ noted that Dr. Tanley's June 26, 2007 opinion was not related to plaintiff's current application for benefits and "pr[e]cedes the alleged onset date by more than a decade. . . ." (Tr. 22). The ALJ also explained that "the record contains other opinion evidence more relevant to the period at issue." (*Id.*). The ALJ also noted the discrepancy between plaintiff's education records, showing IQ scores in the 70s, and Dr. Tanley's assessed IQ scores in the 60s. The ALJ found "[t]here is nothing in the record to indicate what would cause such decline in scoring, absent some sort of purposeful manipulation of answers." (*Id.*). In addition, the ALJ concluded that the evidence does not show plaintiff has significant deficits in adaptative functioning currently manifested by an extreme limitation or marked limitation in any area of mental health functioning. (Tr. 23).

Plaintiff argues that Dr. Tanley's opinion that she is moderately limited in her ability to understand and follow simple instructions and to maintain attention to perform simple, repetitive tasks is inconsistent with "the full ability to perform simple, routine, repetitive tasks as the RFC allows." (Doc. 12 at PageID 975 citing Tr. 20). Dr. Tanley further opined that plaintiff's recent and remote memory were superficial to poor and her cognitive testing put her in the low average to mental retardation range, which plaintiff argues is also inconsistent with the ALJ's assessed RFC. (*Id.*, citing Tr. 345). However, plaintiff does not address or challenge the ALJ's specific reasons for finding Dr. Tanley's opinion not persuasive: it was not related to the current application; it occurred more than 10 years prior to plaintiff's alleged onset date; and there was no evidence to explain the discrepancy between Dr. Tanley's assessed IQ scores and the higher ones plaintiff obtained in school. Plaintiff's argument rests on the mistaken premise that Dr. Tanley's opinion was deemed "persuasive." It was not. In the absence of any argument by plaintiff explaining why the ALJ's assessment of Dr. Tanley's report is not substantially supported, the Court rejects the premise of plaintiff's argument.

The ALJ found Dr. Griffiths' opinions "generally persuasive," stating:

> On April 23, 2022, the claimant presented to Dr. Griffiths for psychological consultative examination (5F). Dr. Griffiths examined the claimant and gave somewhat vague conclusions regarding work-related limitations. However, in general, Dr. Griffiths' examination findings and narrative conclusions are consistent with the overall evidence and are uncontroverted. Indeed, there is no opinion indicating greater limitations. He noted some deficits primarily in stress tolerance and social functioning, which have been accommodated by the residual functional capacity. Indeed, the findings are indicative of no more than moderate level of severity. Therefore, Dr. Griffiths' opinion is generally persuasive.

(Tr. 22).

Plaintiff argues that the ALJ "found all mental health opinions unpersuasive except that of Dr. Griffiths" whose opinion is "hardly vocationally relevant and what is vocationally relevant . . . precludes work." (Doc. 12 at PageID 975). Plaintiff argues the ALJ erred when he based the mental RFC on a mischaracterized, vocationally irrelevant opinion from Dr. Griffiths and the raw medical data. Plaintiff acknowledges that the RFC determination is one solely for the ALJ, but she contends that "the determination must be supported by at least one medical opinion." (*Id.* at PageID 970, citing district court cases).

To the extent plaintiff argues the ALJ cannot render an RFC without reliance on some medical opinion, plaintiff is mistaken. As the Sixth Circuit has explained:

> [The plaintiff] contends that once the ALJ decided to give no weight to the physicians' opinions regarding his ability to work, the ALJ was required to get the opinion of another physician before setting the residual functional capacity. We disagree. We have previously rejected the argument that a residual functional capacity determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ. *See Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 442-43 (6th Cir. 2017) (rejecting the argument that "the ALJ's [residual functional capacity] lacks substantial evidence because no physician opined that [the claimant] was capable of light work"); *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013) (rejecting the same argument because "the ALJ is charged with the responsibility of determining the [residual functional capacity] based on her evaluation of the medical and non-medical evidence"). We similarly find no error here. The ALJ undertook a laborious evaluation of the medical record when determining the residual functional capacity, and substantial evidence supports the ALJ's conclusions.

*Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401-02 (6th Cir. 2018). "'[T]o require the ALJ to base h[is] RFC finding on a physician's opinion, would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory

responsibility to determine whether an individual is disabled.'" *Shephard*, 705 F. App'x at 442 (quoting *Rudd*, 531 F. App'x at 728).

Plaintiff's argument that the ALJ impermissibly based his RFC restrictions on "raw" medical data without a medical opinion to support such restrictions is not well-taken. First, the ALJ did not rely solely on "raw" medical data in crafting an RFC. Rather, the ALJ considered the record as a whole, including Dr. Griffiths' opinion, in assessing plaintiff's limitations. The ALJ accommodated the limitations in social functioning identified by Dr. Griffiths by limiting plaintiff to only occasional contact with co-workers and supervisors; no public contact; no teamwork or tandem tasks; and no close over the shoulder supervision. Plaintiff argues that nothing in Dr. Griffiths' statement surrounding social interaction indicates he felt she can occasionally interact with co-workers and supervisors. (Doc. 12 at PageID 973). But Dr. Griffiths' report noted that plaintiff's previous employment was not terminated due to interpersonal conflicts but rather the termination of her cleaning contract and her drug conviction. In addition, plaintiff reported that when she was in the workforce, she "sometimes" shared an argumentative relationship with supervisors, coworkers and the public. (Tr. 558). Likewise, the ALJ noted that plaintiff's therapy notes with Ms. Bindas consistently reflected normal speech and attitude (Tr. 21, citing Tr. 523, 526, 529, 532, 535, 538, 897, 900) and hospital emergency department records reflected the same (*id.*, citing Tr. 585, 590, 762). The ALJ's RFC limitations reasonably address plaintiff's limitations in social functioning.

Plaintiff also argues the ALJ's RFC limitations on fast-paced work and production quotas do not adequately address Dr. Griffiths' limitations on sustaining concentration and persisting in

work-related activity at a reasonable pace. (Doc. 12 at PageID 972). Plaintiff points to Dr. Griffiths' report noting plaintiff's "statements suggest[ing] that she has difficulty mentally focusing" and "is easily fatigued." (*Id.*). Plaintiff contends the RFC does not adequately address Dr. Griffiths' assessment that plaintiff's symptoms "may interfere with [plaintiff's] ability to keep up with others" in a normal work environment. (Doc. 12 at PageID 973). According to plaintiff, Dr. Griffiths' observation that when plaintiff is "overwhelmed and/or provoked, she probably responds impulsively through emotional rather than cognitive channels," is work-preclusive and that the ALJ failed to build a logical bridge between this observation and the RFC. (Doc. 16 at PageID 992, citing Tr. 561-62).

When discussing plaintiff's limitations in concentrating, persisting, or maintaining pace and ability to deal with stress, the ALJ found plaintiff only moderately limited, noting:

> Some of the claimant's treatment notes show that she has poor concentration, but other notes show that she has normal concentration (4F/13, 14 versus 4F/15). Moreover, the examinations of record consistently show that the claimant has normal cognition, thought process, and thought content (4F/24-25, 27-28, 30-31, 33-34, 36-37, 39-40, 42-43, 45-46; 13F/15-16, 18-19). On very remote consultative examination in 2007, the claimant's thoughts were coherent, relevant, and goal oriented (2F/3). On more recent consultative examination, the claimant was able to follow the conversation and she did not ask the examiner to repeat or clarify questions (5F/7). However, she was slow performing Serial 7s task but she committed only one error when performing Serial 3s task (5F/7). Notably, the claimant performed at an adequate pace (5F/7).
>
> * * *
>
> The claimant has never been psychiatrically hospitalized, and the consultative examiner noted that she was not taking psychoactive medication at that time (5F/8). The examiner speculated that when provoked or overwhelmed, the claimant "probably" responds impulsively (5F/8). The evidence indicates a moderate level of severity of symptoms. There is no opinion indicating greater than a moderate limitation in any mental health area. Therefore, the claimant's impairments were

> accounted for with a limitation to simple, routine, and repetitive tasks, with limitations to social interaction, pace, and work stress, like changes in routine.

(Tr. 21-22).

The ALJ's RFC for "simple, routine, repetitive tasks"; "no fast paced work"; "no strict production quotas"; and "very little, if any change in the job duties or the work routine from one day to the next" adequately addresses plaintiff's moderate limitations in concentration, pace, and stress. *See Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 437 (6th Cir. 2014) ("the limitation to simple, routine, and repetitive tasks adequately conveys Smith–Johnson's moderately-limited ability "to maintain attention and concentration for extended periods."); *cf. Parks v. Soc. Sec. Admin.,* 413 F. App'x 856, 866 (6th Cir. 2011) (limitation to no "more than simple instruction" reflects doctor's determination that the claimant's ability to understand and remember was limited because of long-term memory impairment). The ALJ was not required to credit Dr. Griffiths' speculative comments that when plaintiff is "overwhelmed and/or provoked, she *probably* responds impulsively through emotional rather than cognitive channels" or Dr. Griffiths' opinion that plaintiff's symptoms such as intrusive thoughts, flashbacks, and hypervigilance "may" interfere with patient's ability to keep pace with others. (Tr. 562). *See Benson v. Saul*, No. 3:19-cv-02804, 2021 WL 1554219, at *5 (N.D. Ohio Jan. 11, 2021), *report and recommendation adopted*, 2021 WL 804150 (N.D. Ohio Mar. 2, 2021) (no reversible error where an ALJ did not credit a medical opinion employing qualifying language such as "may" or "likely"). The ALJ thoroughly reviewed the medical evidence, including the evidence of plaintiff's limited intellectual functioning, psychometric testing, Ms. Binda's normal mental status examination findings, and Dr. Griffiths' "generally persuasive" opinion and converted the

opined limitations into vocationally relevant terms before incorporating such limitations into an RFC and hypothetical question to the VE. *See Latonya J. v. Comm'r of Soc. Sec.*, No. 1:24-cv-684, 2026 WL 850743, at *3 (S.D. Ohio Mar. 27, 2026) ("[C]ourts have recognized that 'it may fall to the ALJ to convert and incorporate the limitations set forth in a medical opinion into vocationally relevant terms.'") (citing cases); *see also Aalijah W. v. Comm'r of Soc. Sec*., No. 2:23-cv-1955, 2024 WL 1714484, at *6 (S.D. Ohio Apr. 22, 2024), *report and recommendation adopted*, 2024 WL 2315290 (S.D. Ohio May 22, 2024). The Court finds that the ALJ adequately addressed plaintiff's pace and productivity restrictions by limiting her to "no fast paced work" and "no strict production quotas." (Tr. 20). Further, the ALJ's decision accounted for Dr. Griffiths' observations that stressful situations may exacerbate plaintiff's PTSD-related symptoms and cause mood extremes or angry outbursts by translating them into vocationally relevant terms consistent with the record as a whole, i.e., limitations to simple, routine, repetitive tasks; occasional contact with co-workers and supervisors; no public contact; no teamwork or tandem tasks; no close over the shoulder supervision; no fast paced work; no strict production quotas; and very little if, if any, change in the job duties or the work routine from one day to the next.

Based on the foregoing, the ALJ properly converted Dr. Griffiths' assessed limitations related to social interaction and dealing with pressure in a work setting into relevant vocational terms for incorporation into the RFC, and the ALJ's assessment of plaintiff's RFC is based on substantial evidence.

Given the foregoing conclusion, plaintiff's related argument fails. Namely, plaintiff contends the ALJ erred by not including in the RFC the work-preclusive limitations asked in one of the hypotheticals at the hearing, i.e., requiring an isolated workstation or ability to work away from others due to angry outbursts. (Doc. 12 at PageID 975, referring to Tr. 76-77). The VE testified that requiring an isolated workstation or the ability to work away from others would be "work preclusive," and there would be "[n]o tolerance" for a hypothetical individual experiencing angry outbursts at others in the workplace (Tr. 76-77).

Although the Sixth Circuit has rejected a brightline rule holding that all of a claimant's limitations must be listed verbatim in a hypothetical question, it "should include an accurate portrayal of [his or her] individual physical and mental impairments." *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 632 (6th Cir. 2004). The fact that the ALJ asked about the residual functional capacity of a hypothetical person with particular limitations does not mean the VE's answer is binding on the ALJ. "It is well established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact." *Winslow v. Comm'r of Soc. Sec.*, 566 F. App'x 418, 421-22 (6th Cir. 2014) (*quoting Casey v. Sec'y of H.H.S.*, 987 F.2d 1230, 1235 (6th Cir. 1993)). Simply posing a hypothetical question to the VE does not result in a finding about a claimant's RFC or bind the ALJ where the medical record does not support the inclusion of such limitations. *Lipanye v. Comm'r of Soc. Sec.*, 802 F. App'x 165, 170 (6th Cir. 2020) (citing *Kessans v. Comm'r of Soc. Sec.*, 768 F. App'x 531, 536 (6th Cir. 2019)). *See also Aiello v. Comm'r of Soc. Sec.*, No. 1:19-cv-01558, 2020 WL 2526956, at *3 (N.D. Ohio May 18, 2020) (finding "the mere

fact that the ALJ asked the VE about certain hypothetical limitations does not mean that the ALJ is then required to adopt them into the RFC") (citing *Sayler v. Comm'r of Soc. Sec.*, 574 F. App'x 595, 596 (6th Cir. 2014) (per curiam)).

The RFC crafted by the ALJ reflects the limitations he found credible and supported by the evidence. The ALJ was not required to include limitations that were not supported by the evidence. Because the RFC adopted by the ALJ is supported by substantial evidence, he did not err by failing to include the additional limitations of an isolated workstation or ability to work away from others due to angry outbursts.

## III. Conclusion

Based on the foregoing, plaintiff's Statement of Errors (Doc. 12) is **OVERRULED**, and the Commissioner's non-disability finding is **AFFIRMED. IT IS THEREFORE ORDERED** that judgment be entered in favor of the Commissioner and this case is closed on the docket of the Court.

**IT IS SO ORDERED.**

Date: **Sep 14, 2026**

Karen L. Litkovitz
United States Magistrate Judge